Filed 3/13/26  P. v. Burnham CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E084091 |
| v. | (Super.Ct.No. VCR1431) |
| FLOYD NORVEL BURNHAM, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Enrique Guerrero, Judge.  Affirmed.

Arielle Bases, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa Mandel and Tami Falkenstein Hennick, Deputy Attorneys General, for Plaintiff and Respondent.

1

INTRODUCTION

In 1981, a jury convicted defendant and appellant Floyd Burnham of first degree murder after hearing evidence that he and his accomplice Audis Coley robbed and killed a man who had picked them up as hitchhikers. At trial, Coley testified that Burnham had devised the plan to rob the victim of his money and truck and had been the one to shoot the victim when that plan went awry. Burnham was sentenced to 25 years to life plus two years.

In 2022, Burnham filed a resentencing petition under Penal Code section 1172.6, alleging that he could not currently be convicted of murder because of recent changes to felony murder liability made by Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437). (Pen. Code, § 1172.6, subd. (a).)[1] Following an evidentiary hearing, the trial court found beyond a reasonable doubt that Burnham was guilty of murder under current law because he was a major participant in the robbery who acted with reckless indifference to human life. (§ 189, subd. (e)(3).)

On appeal, Burnham argues that the trial court violated his federal due process right to a fair trial by excluding the defense investigator's statement that Coley's brother told him (the investigator) that Coley had admitted, on his deathbed, to being the shooter. We affirm. Given the circumstances of Coley's admission and the fact that his brother was unavailable to testify, we conclude that the trial court did not abuse its discretion by

---

[1] Unlabeled statutory citations refer to the Penal Code.

2

determining that the double hearsay statement was not sufficiently trustworthy to be admitted as a declaration against interest.  (Evid. Code, § 1230.)

## FACTUAL AND PROCEDURAL BACKGROUND

A.  *Burnham's Arrest and Coley's Guilty Plea*

On October 8, 1980, a body was found in the desert near Highway 395, north of Adelanto, near an abandoned pick-up truck.  The victim had a gunshot wound in his stomach and his face had been eaten by wild animals.  The police identified the victim as Jack Blanchard, a 47-year-old Oregon resident and the registered owner of the truck.

Several days earlier, Blanchard had stayed for three nights with his sister in San Andreas, California.  Blanchard's wife of 27 years had recently filed for divorce, and he was on his way to visit his mother in Arizona.  When Blanchard arrived at his sister's home, he was travelling with Burnham and Coley, two hitchhikers he had picked up in Oregon on his drive south.

The detective investigating the murder located Burnham and Coley out of state and extradited them to California.  After initially placing the blame entirely on Burnham, Coley admitted being involved in the murder and helped the police to locate the murder weapon and other inculpatory evidence.  The People charged Burnham and Coley with murder.  Coley pled guilty to robbery in exchange for a five-year sentence and for agreeing to testify against Burnham.

3

A.  *Burnham's Trial*

   1.  Coley's Testimony

Coley testified that he and Burnham were lifelong friends who had grown up together in Mississippi and that Burnham had told him not to testify against him.  In the summer of 1980, when he and Burnham were 19 and 20 years old, respectively, they left Mississippi in search of work.  They spent time in Texas and California before ending up in Oregon.

On the morning of September 26, 1980, they were hitchhiking on a roadside just south of Lakeview, Oregon when a man driving a large pick-up truck with a camper stopped to pick them up.  The man introduced himself as Blanchard and told them that he was heading to Arizona after first visiting his sister and niece in San Andreas, California.  The first thing Coley noticed inside the cab was a revolver sitting in the open glove compartment.  On the way to San Andreas, Blanchard stopped to make coffee, and Coley saw that Blanchard kept three rifles in one of the camper's cabinets.

The men arrived in San Andreas late in the evening on September 26 and stayed with Blanchard's sister and her two daughters for three days.  Before they departed on September 29, one of Blanchard's nieces gave Coley and Burnham two zip-up sweatshirts—one grey and one blue.

When they reached Bishop, they stopped at a small bar where they drank beer and smoked marijuana.  Afterward, Blanchard asked Burnham to drive while he slept in the camper.  With Blanchard out of earshot, Burnham suggested they steal his money and truck and drive back to Mississippi.  Coley agreed with the plan.  A little while later,

4

Burnham and Coley found a small bar in Red Mountain and sold the revolver in the glove compartment for $20. Before entering the bar, they secured the door of the camper shut with rope. At some point, Blanchard woke up, climbed out of the camper window when the door would not open, and retrieved them from the bar.

Blanchard resumed driving, heading south on Highway 395. Just north of Kramer Junction, he pulled over to use the restroom. When he returned to the truck, Burnham and Coley surrounded him and demanded his money. Blanchard said, "no," and pulled one of the rifles out from behind the driver's seat. At trial, Coley testified that Blanchard must have taken the rifles out of the camper after the incident in Red Mountain. Coley grabbed the barrel as Blanchard fired a shot, and the bullet went into the air. Burnham twisted the rifle out of Blanchard's hands and gave it to Coley, who ordered Blanchard out of the truck.

Burnham found another rifle behind the passenger seat, and they made Blanchard walk to the back of the truck. Burnham beat Blanchard to the ground with his fists, took the billfold out of Blanchard's back pocket, and struck Blanchard across the head with the butt of one of the rifles. The rifle broke in two from the blow, and Burnham tossed the pieces down a nearby embankment. Blanchard was slumped on the ground, crying and bleeding profusely. Coley handed his rifle to Burnham, and Burnham ordered Blanchard to get inside the truck.

Before starting the ignition, Burnham reached under the driver's seat, retrieved a hunting knife, and gave it to Coley. As they drove south on Highway 395, Burnham kept one of the rifles against his leg. Coley held the knife to Blanchard's throat and threatened

5

to kill him if he moved. Burnham drove past Kramer Junction, then turned off the highway and drove into the desert. They drove in silence, and Coley assumed they were going to let Blanchard go somewhere in the desert.

After about two miles, Burnham stopped the truck. Coley removed the knife from Blanchard's throat, and Blanchard grabbed the knife and lunged at Burnham. Coley slid out of the truck and watched as Burnham and Blanchard struggled over the knife and then fought to gain possession of one of the rifles. Burnham and Blanchard fell out of the truck and continued to wrestle for the rifle. Coley grabbed Blanchard's shoulder and ordered him to let go of the rifle. Blanchard obeyed, and Burnham took the rifle and handed it to Coley. Burnham's thumb had been cut during the struggle over the knife and was bleeding badly.

Burnham and Coley ordered Blanchard to walk out into the desert. As Blanchard walked, Burnham told Coley to shoot him. Blanchard's face and head were bleeding, and he begged them not to shoot. Coley told Burnham he could not shoot him, and Burnham told Coley that if their roles were reversed Blanchard would kill them. Coley refused and gave the rifle to Burnham. Coley turned away but heard Burnham fire a shot and then saw Blanchard fall.

Coley and Burnham ran back to the truck and tried to drive away, but the wheels were stuck in the sand. As they prepared to set off on foot, Burnham gathered their belongings from the camper, and Coley checked on Blanchard to see if he was dead. Blanchard was lying on his back with a gunshot wound in his stomach and was not

moving. Coley removed the plaid shirt he was wearing and gave it to Burnham to wrap around his thumb, which was still bleeding.

They started walking back toward Highway 395, carrying a duffel bag full of clothes, the road atlas, and the two rifles. Once they put some distance between themselves and Blanchard, they abandoned the duffel bag, buried one of the rifles, and tossed the other rifle into some bushes near the highway.

They slept for a few hours next to a wash and, in the early morning hours of September 30, they came upon a trailer where two older men lived. The men let them wash their hands in their outdoor basin, then gave them a ride to Victorville, the nearest town with a bus station. The men dropped them off in front of a hospital so Burnham could get medical treatment for his thumb. As soon as the men drove off, Burnham and Coley got breakfast, then used the money they stole from Blanchard (which Coley estimated to be about $70) to purchase two bus tickets to Phoenix, Arizona.

From Phoenix, they began hitchhiking back to Mississippi and were arrested on a separate robbery charge in Louisiana. About a month after the murder, Coley and Burnham were arrested and extradited to California to face charges in the case underlying the present petition.

2. Evidence Corroborating Coley's Testimony

After initially placing the entire blame on Burnham, Coley admitted his involvement in the robbery and Blanchard's death and agreed to help in the investigation. He took the police to the Red Mountain bar where they sold Blanchard's revolver and to the trailer in Adelanto where they met the men who gave them a ride to Victorville. He

7

participated in a filmed reenactment of the shooting, and he helped the police search for the items he and Burnham had discarded during their flight from the murder scene. In the desert, the police recovered both rifles (one was partially buried and the other was in a bush), the road atlas, and several of Coley's and Burnham's belongings.

At the murder scene, all four wheels of Blanchard's truck were stuck in the sand. The driver's side door was open, the key was in the ignition, and there was a hunting knife on one of the seats. There were blood stains on the keys and around the ignition, on the knife, both doors, and the tailgate; and there were several blood stains inside the camper. On the ground near the truck, the police found a plaid shirt with a significant amount of blood stains. Although Burnham and Coley shared the same basic blood type, the People's blood analysis expert testified that blood found inside the camper and on the victim's hat matched Burnham's other blood markers and not Coley's.

Blanchard's sister corroborated Coley's testimony about how long the group stayed at her home, what they did, and the two sweatshirts her older daughter gave to Coley and Burnham. She and her younger daughter both testified that Coley was a quiet person and that Burnham did most of the talking. The daughter testified that she got the impression that, of the two of them, Burnham was "the doer."

A bartender who worked at the Red Mountain bar (that Coley led the police to) testified that he bought a revolver for $20 from two men who came into the bar on the evening of September 29.

The two men who gave Coley and Burnham a ride to Victorville testified that Burnham had a cut on this thumb that looked like it required medical attention. One of

8

the men described the cut as "pretty nasty," going "all the way around" his left thumb and "right down to the bone." According to that witness, Burnham did most of the talking, claiming that their car had broken down and he had cut his thumb on the fan, trying to restart the engine.

The investigating detective testified that the first time he saw Burnham in custody, Burnham had a suture scar on his left thumb and was wearing a blood-stained dark blue zip-up hoodie.

3. Defense Case

The inmate with whom Burnham shared a jail cell pending trial testified in Burnham's defense. The inmate said that he met Coley in jail and shared a cigarette with him. He said that Coley told him he had made a deal with the District Attorney and was "lying on Burnham" because it was better "for [Burnham] to do the time than for him." The inmate admitted that he disliked "snitches" and that he and Burnham had become friends while sharing a cell.

4. Verdict and Sentencing

The prosecution tried Burnham under both premeditated and felony murder theories. The jury convicted him of first degree murder and found true the allegation that he used a firearm in the commission of the murder. (§§ 187, 12022.5.) The trial court sentenced him to 25 years to life for the murder, plus two years for the gun enhancement.

C. *Senate Bill 1437 and Section 1172.6*

In 2018, the Legislature enacted Senate Bill 1437 " 'to more equitably sentence offenders in accordance with their involvement in homicides.' " (*People v. Curiel* (2023)

15 Cal.5th 433, 448 (*Curiel*).) As relevant here, the new law, which went into effect on January 1, 2019, narrowed the definition of first degree felony murder "to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f); Pen. Code, §§ 188, 189.)

Senate Bill 1437 also created former section 1170.95, now section 1172.6, which provides a mechanism for retroactive application of the amended law to those convicted under prior law. (§ 1172.6.) Under section 1172.6, a defendant may petition for relief in the court where they were sentenced if: (1) the complaint or information filed against them allowed the prosecution to proceed under a theory of felony murder; (2) they were convicted of first degree or second degree murder following a trial; and (3) they "could not presently be convicted of murder . . . because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subds. (a)(1)-(3).)

If a petitioner makes a prima facie showing that they are entitled to relief, the trial court must issue an order to show cause and hold an evidentiary hearing to determine whether to vacate the conviction, recall the sentence, and resentence the petitioner on any remaining counts. (§ 1172.6, subd. (d)(1).) At the evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).)

*D.  Burnham's Section 1172.6 Petition*

In June 2022, Burnham filed a resentencing petition under section 1172.6, alleging that he had been tried and convicted of first degree murder under a theory of felony murder and that he could not currently be convicted of murder because of changes to felony murder liability in section 189.  After briefing and argument, the trial court ruled that Burnham had made a prima facie showing of eligibility and ordered an evidentiary hearing.

1.  Motion to Admit Coley's Statement

Before the evidentiary hearing, Burnham moved to admit a statement from Coley, made just before he died, claiming that he shot Blanchard while Burnham was sleeping. Defense counsel sought to admit the statement through his investigator as a declaration against interest under Evidence Code section 1230.

The defense investigator contacted Coley's brother, Billy Coley, in September 2023, in preparation for the evidentiary hearing.  According to the investigator's declaration, Billy said that Coley had cancer and was living with him on hospice when he died from the disease a year earlier.  According to Billy, on the day he died, Coley had asked him to "take care of something for him."

Billy said that Coley said that he (Coley) shot Blanchard one evening while Burnham was sleeping.  Coley said that he thought Blanchard was trying to rob him because he "made advances."  In response, Coley picked up a rifle that was nearby, shot Blanchard, and went back to sleep.  Coley said, "[Burnham] didn't do it.  [Burnham] was asleep."

11

Billy told the investigator that he had relayed Coley's admission to Burnham's sister. He believed the investigator had contacted him because the sister had given the new information to the public defender. Billy said he had known Burnham's sister his entire life and that she lived nearby. He said that, even though he had a heart condition, he was willing to travel to California "for any court proceedings."

The court ruled that Billy could testify as to Coley's statement because it qualified as a declaration against interest. In response to the prosecutor's objection to any kind of remote appearance, the court ordered that Billy had to testify in person.

A few months later, Billy became unable to testify in court for medical reasons, and Burnham filed a motion to admit Billy's statement as an exculpatory statement by an unavailable witness under *Chambers v. Miss.* (1973) 410 U.S. 284 (*Chambers*). At the hearing on the motion, the court concluded that *Chambers* did not apply and that the—now double—hearsay statement was insufficiently reliable to qualify for declaration against interest exception.

The court reasoned that, given Coley's guilty plea and impending death, his statement was insufficiently detrimental to his penal or social interests. The court also questioned Coley's motive in making the statement, given the substantial amount of time that had passed since the crimes. Observing that the trial evidence showed that Coley and Burnham were lifelong friends before the incident, the court was concerned that Coley "made this statement to exonerate his friend that's still in custody."

Given those reliability issues, the court concluded that the defense investigator lacked the personal knowledge necessary to establish the proper foundation for the two hearsay statements.

2. The Evidentiary Hearing

The People submitted the transcripts of Burnham's murder trial into evidence and the court heard oral argument. Applying the standards articulated in *People v. Banks* (2015) 61 Cal.4th 788 and *People v. Clark* (2016) 63 Cal.4th 522, the court found that the trial evidence demonstrated beyond a reasonable doubt that Burnham was a major participant in Blanchard's robbery and that he acted with reckless indifference to human life within the meaning of section 189. On the basis of that finding, the court concluded that Burnham could be convicted of murder under current law and denied his petition.

DISCUSSION

Burnham argues that the trial court violated his constitutional right to a fair trial when it refused to consider potentially exculpatory evidence at his resentencing hearing. We disagree.

"Few rights are more fundamental than that of an accused to present witnesses in his own defense. [Citations.] [But i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." (*Chambers*, *supra*, 410 U.S. at p. 302.) Thus, as our Supreme Court has repeatedly explained, " '[a] defendant does not have a constitutional right to the

admission of unreliable hearsay statements.' " (*People v. Ayala* (2000) 23 Cal.4th 225, 269, citing *People v. Fudge* (1994) 7 Cal.4th 1075, 1123.)

Section 1172.6 permits the parties to introduce "new or additional evidence" at the resentencing hearing, and such evidence "shall be governed by the Evidence Code." (§ 1172.6, subd. (d)(3).) Evidence Code section 1230 sets out the hearsay exception for statements against interest: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of civil or criminal liability . . . , or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true."

The rationale for the exception is that a person's interest against being criminally implicated or socially disgraced " 'gives reasonable assurance of the veracity of his statement made against that interest,' thereby mitigating the dangers usually associated with the admission of out-of-court statements." (*People v. Grimes* (2016) 1 Cal.5th 698, 711.) To satisfy the exception, the proponent " 'must show "that the declarant is unavailable, that the declaration was against the declarant's penal [or other] interest, and that the declaration was *sufficiently reliable* to warrant admission despite its hearsay character." ' " (*People v. Geier* (2007) 41 Cal.4th 555, 584, italics added.)

"[E]ven when a hearsay statement runs generally against the declarant's penal [or other] interest . . . , the statement may, in light of circumstances, lack sufficient indicia of trustworthiness to qualify for admission." (*People v. Duarte* (2000) 24 Cal.4th 603, 614.)

14

" 'There is no litmus test for the determination of whether a statement is trustworthy and falls within the declaration against interest exception.' " (*People v. Tran* (2013) 215 Cal.App.4th 1207, 1217.)  "In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant." (*People v. Frierson* (1991) 53 Cal.3d 730, 745.)  " 'The decision whether trustworthiness is present requires the court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception.' " (*Ibid*.)

"[A] trial court has broad discretion to determine whether a party has established the foundational requirements for a hearsay exception." (*People v. DeHoyos* (2013) 57 Cal.4th 79, 132.)  We review the trial court's ruling for abuse of discretion, and we will not overturn it " 'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' "[2]  (*People v. Brown* (2003) 31 Cal.4th 518, 534 (*Brown*).)

---

[2]  We reject Burnham's claim that we must review the evidentiary ruling de novo. The case he cites as authority for that proposition, *People v. Albarran* (2007) 149 Cal.App.4th 214, is inapposite because it pertains to the standard of review applicable to a trial court's order denying a motion for new trial. (*Id.* at p. 224, fn. 7.)  As that case acknowledged, a trial court's evidentiary rulings are reviewed for abuse of discretion. (*Id.* at p. 224.)

The case of *People v. Chhoun* (2021) 11 Cal.5th 1 (*Chhoun*) is instructive to our analysis. There, as here, the defendant's accomplice made an out-of-court statement that he (the accomplice) had killed the robbery victim, not the defendant. The defendant and the accomplice had been involved in a home invasion robbery during which a husband and wife and their three children were killed. (*Id.* at pp. 11-15.) The accomplice pled guilty to various counts in exchange for a sentence of 50 years to life imprisonment. (*Id.* at p. 46.) Years later, a defense investigator interviewed the accomplice in prison in preparation for the defendant's capital trial. (*Ibid.*) The accomplice took responsibility for killing the wife and her three children. He said that after " 'the man' " was shot, " 'he lost it or went crazy, shot the woman, [then] ran into the bedrooms and shot the children.' " (*Ibid.*) The accomplice initially agreed to testify at the defendant's trial, then later refused on the advice of his counsel. (*Ibid.*)

The defendant sought to introduce the accomplice's interview statements as declarations against penal interest, but the trial court ruled that they were "insufficiently reliable" to satisfy the hearsay exception. (*Chhoun*, *supra*, 11 Cal.5th at p. 45.) On appeal, our Supreme Court rejected the defendant's claim that the trial court violated his constitutional right to a fair trial by excluding the exculpatory evidence. (*Id.* at p. 50.) *Chhoun* concluded that the accomplice's statement lacked the requisite hallmarks of reliability. First, the statement was not sufficiently detrimental to the accomplice's penal interests. Claiming responsibility, "[b]elatedly," for some of the shootings could not result in additional punishment because the accomplice had already been convicted of crimes arising from the robbery. (*Id.* at p. 48.) And, the potential that the admission

16

could affect the accomplice's chances of obtaining parole or motion for a new trial, in the event he later decided to withdraw his guilty plea, was "too speculative or remote . . . for purposes of Evidence Code section 1230." (*Ibid*.)

Second, the admission was not close in time to the crimes in question. A " 'significant passage of time is a relevant circumstance to be considered when determining a statement's reliability,' " and the accomplice had waited years to claim responsibility for the murders. (*Chhoun*, *supra*, 11 Cal.5th at p. 48.) Third, the accomplice was "a demonstrated liar, and his current account was 'completely contrary' to all of his previous statements." (*Ibid.*)

Fourth, the evidence suggested that the accomplice had a motive to lie. As *Chhoun* explained, although admitting to the murder of a mother and her children would likely subject a person to social disgrace within the *general* community, "certain aspects of [his] *particular* community meant he could actually benefit from making a false confession." (*Chhoun*, *supra*, 11 Cal.5th at p. 49.) Because the was "a high-ranking gang leader" and the accomplice was a "relative newcomer to the gang," the accomplice "might have believed that taking the blame for a more senior member's crimes, thus helping him evade the death penalty, could enhance his position in the gang or help to secure his safety in prison." (*Id.* at pp. 49-50.) Given all of those reliability issues, *Chhoun* concluded that the trial court acted well within its discretion by excluding the purported admission. (*Ibid.*)

Coley's deathbed admission raises similar reliability concerns. Like the accomplice in *Chhoun*, Coley was a demonstrated liar and his statement to Billy was

contrary to all of his previous statements. Coley initially told the police that Burnham was solely responsible for Blanchard's death; at trial he told the jury that he shared responsibility for the robbery and murder; and, on his deathbed, he made a complete reversal and claimed that he was solely responsible. As the Court observed in *Chhoun*, "[i]nconsistent accounts cast doubt on the reliability of a declarant's statements." (11 Cal.5th at p. 48.) And, as in *Chhoun*, the evidence that Coley's statement was sufficiently detrimental to his penal and societal interest is slim. Because of his guilty plea, and his impending death, he faced no prospect of additional punishment. And because of his serious medical condition and impending death, he would not live to face any social fallout. (See, e.g. *People v. Shipe* (1975) 49 Cal.App.3d 343, 354 [To satisfy the hearsay exception, the statement must be " 'distinctly' " against the declarant's penal or other interest "and must be clothed with indicia of reliability."].)

Similarities aside, Coley's out-of-court admission is even more unreliable than the one in *Chhoun*. This is because it was made after a longer period of time, is encased in an additional layer of hearsay, and is contradicted by the trial evidence.

The accomplice in *Chhoun* waited a handful of years to take responsibility for the murders; Coley waited over four decades. Much can happen over such a lengthy period of time, including memory loss and changes in the incentive to tell the truth or fabricate a statement. Given that Burnham was Coley's childhood friend and Coley was suffering from cancer, the trial court could reasonably infer that Coley had a motive to inculpate himself and exonerate Burnham. In the final moments of his life, Coley may have seen an opportunity to help Burnham with little risk to himself by claiming responsibility for

18

the murder on his deathbed. " '[S]ometimes a declarant who makes an inculpatory statement may have a substantial incentive to exculpate others. . . . A trial court in that situation may reasonably conclude that the declarant's incentive to protect his friends renders the exculpatory portions of the statement inadmissible.' " (*Chhoun*, *supra*, 11 Cal.5th at p. 50.)

Burnham argues that the more reasonable inference to draw from the totality of the circumstances is that Coley knew he was dying and wanted to clear his conscience. Burnham argues that the fact Coley made the statement on his deathbed shows that he was lying during his trial testimony and finally taking responsibility for killing Blanchard. But this argument is at odds with our standard of review. It is the trial court's duty to weigh the evidence relevant to reliability, not ours. As long as the court's assessment of the evidence is reasonable, we will uphold the court's evidentiary ruling. (*Brown*, *supra*, 31 Cal.4th at p. 534.) Because Coley and Burnham had been close friends at the time of the murder, it was reasonable for the court to infer a motive to exculpate Burnham.

Moreover, because Coley made the statement when he was on hospice, dying of cancer, his cognitive capacity is also a reasonable reliability concern. Billy was the only witness who could answer questions about Coley's mental state, such as whether Coley was taking medications that affected his cognitive capacity.

The extra layer of hearsay—the fact that Coley's purported admission came second hand from his brother—also raises reliability issues. Because Billy told the investigator that he had known Burnham's sister his whole life and that she lived nearby,

the trial court could reasonably infer that Billy himself had a motive to exculpate Burnham. With his brother deceased, Billy may have seen a way to help Burnham's sister without risk to his own family. Billy's unavailability meant there was no way of probing these areas of concern. Notably, Burnham does not offer a hearsay exception for the second layer of hearsay. (See Evid. Code, § 1201 [multiple layers of hearsay are admissible only if each hearsay statement is admissible under an exception].)

Because there were serious reliability issues with *both* out-of-court statements, the trial court did not abuse its discretion by ruling that the defense investigator could not provide the proper foundation.

Burnham argues that if the trial court could reasonably view Coley's deathbed admission with skepticism, then the court was required to do the same with his trial testimony. Burnham points out that Coley gave at least three accounts of the murder, none of which were the same. But Burnham overlooks "the most crucial difference" between Coley's accounts. (*Chhoun*, *supra*, 11 Cal.5th at p. 50.) Only one of them—the version he gave at trial—was "subject to extensive cross-examination, which allowed the jury to evaluate [his] truthfulness." (*Ibid.*) As the court observed, "the testimony of Mr. Coley . . . was of particular significance [at trial]; and, therefore, his credibility was a substantial issue for th[e] jury to decide as finders of fact." It is also significant that Coley's deathbed admission completely contradicts his trial testimony; the accounts are mutually exclusive. In the version of events Coley provided at trial, Coley and Burnham tried to rob Blanchard of his money and truck, and Burnham was injured during a knife fight with Blanchard before he shot Blanchard. In the version he gave over 40 years

20

later, Coley claimed to be the victim of Blanchard's robbery attempt and claimed to have shot Blanchard then gone to sleep. The fact that the later account could not be subjected to any questioning whatsoever is a good reason for the trial court to view it with skepticism.

Another good reason to view the later account with skepticism is that it directly conflicts with the physical evidence regarding the murder scene and the eyewitness accounts of Burnham's thumb injury. There were blood stains at the murder scene in the places that Coley said Burnham touched after the knife fight—the keys, ignition, camper, and plaid shirt, and multiple witnesses who saw Burnham shortly after the murder noticed the cut on his thumb. All of that evidence is consistent with the version of events that Coley testified to at trial.

In any event, assuming it was error for the trial court to exclude the double hearsay statement as insufficiently reliable, Burnham cannot demonstrate prejudice—even under the heightened standard articulated in *Chapman v. California* (1967) 386 U.S. 18. (See *id.* at p. 24 [Where the error is one of federal constitutional magnitude, reversal is required unless the error was "harmless beyond a reasonable doubt."].) This is because, even if the court admitted the statement, it still had broad discretion to determine its relevance. (*People v. Jones* (2013) 57 Cal.4th 899, 947.) Given the trial court's finding that the trial evidence established beyond a reasonable doubt that Burnham was a major participant in the robbery who acted with reckless indifference to human life and, given the trial court's stated views on the reliability of the deathbed admission, we have no

doubt that Coley would not have obtained a different outcome had the court considered the admission at the resentencing hearing.

For all of these reasons, we reject Burnham's claim of reversible error.

DISPOSITION

The order denying Burnham's resentencing petition is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS _____

J.

We concur:

RAMIREZ _____

P. J.

RAPHAEL _____

J.